NEBRASKA PUBLIC POWER DISTRICT, A PUBLIC CORPORATION AND POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLEE, V. DENNIS R. MUNDERLOH ET AL., APPELLANTS.
LEON BRUNS AND RONALD BRUNS, DOING BUSINESS AS BRUNS BROTHERS, A PARTNERSHIP, ET AL., APPELLANTS, V. NEBRASKA PUBLIC POWER DISTRICT, A PUBLIC CORPORATION AND POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLEE.

403 N.W.2d 374

Filed April 10, 1987.   No. 85-503.

David A. Domina and Douglas J. Stratton of Domina & Gerrard, P.C., for appellants.

Noyes W. Rogers of Leininger, Grant, Rogers & Maul, and John C. McClure, for appellee.

Richard M. Duxbury and Mary C. Wickenkamp of Erickson & Sederstrom, P.C., for amici curiae Chambers et al.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Hastings, J.

This appeal involves 10 consolidated cases relating to construction of easements for an electric power transmission line held by Nebraska Public Power District (NPPD) over various properties located in Thurston County. The cases in which NPPD is the plaintiff are suits seeking injunctions against the landowners to prevent their interference with the use of the easements; the remaining actions are suits for declaratory judgments filed by the landowners seeking adjudications that the easements have expired. The trial court held generally in favor of NPPD in all cases, and the landowners have appealed. The assignments of error simply relate generally to the claimed error of the trial court in not declaring the expiration or termination of the easements. We affirm.

In the early 1970s, NPPD undertook planning studies to construct a 345,000-volt transmission line in northeast Nebraska to interconnect with an Iowa Public Service substation near Raun, Iowa. The line was proposed to run across Stanton, Wayne, Thurston, and Dakota Counties. During late 1978 and early 1979 numerous easements were obtained along the selected route, and construction of the transmission line began.

The documents creating the right-of-way easements now in dispute all contain the following language:

> The District agrees that should said right of way not be used for the purposes herein stated, or should any transmission line constructed hereunder be removed and not replaced by another transmission line, for a period of five years, the right of way and easement hereby secured shall then cease and terminate, and this instrument shall be of no further force and effect.

This language apparently was based on that contained in Neb. Rev. Stat. § 70-303 (Reissue 1986), which reads as follows: "If any pole line or underground line constructed under section 70-301 be abandoned for a period of five years, the right-of-way or easement acquired for its construction shall revert to the owner of the property affected." NPPD argues that the added language in the easement documents relating to "used for the purposes herein stated" was for the purpose of limiting the use of the right-of-way for an electric transmission line only.

It is the landowners' contention that although all of the towers for the electric transmission line have long ago been constructed throughout Stanton, Wayne, and Dakota Counties, no construction has been commenced on nor any known use made of the disputed easements in Thurston County for more than 5 years after the granting of the easements. Therefore, they argue, by the very terms of the documents creating the easements, all rights of NPPD have expired because of nonuse for the stated purpose.

However, NPPD points out that the easements are only about 200 feet in width, and because it has no other access rights to the easements, i.e., no public access, it is necessary for the contractor to move the heavy construction equipment along the easement in a sequential manner.

NPPD was then presented with a problem in Thurston County in which the Winnebago Indian Reservation is located. The route selected by NPPD for the transmission line, which in part crossed the lands which are the subject of this litigation, also crossed 27 tracts of Indian land. Although having been assured by the Bureau of Indian Affairs that there would be no problem acquiring easements of the Indian tracts, the tribal council of the Winnebago Indians passed a resolution objecting to the construction of the transmission line through Indian lands. The western boundaries of the reservation and of Thurston County are conterminous.

According to NPPD, it then became apparent that it would be necessary to commence condemnation proceedings to acquire the remaining easements to complete the transmission line. Recognizing the delays which would be occasioned by

protracted litigation, NPPD obtained an amendment to its construction contract to provide for building of the transmission line from the western terminal at the Hoskins substation in an easterly direction, rather than proceeding from the east to the west.

The record reflects that on April 30, 1979, the Winnebago Tribe filed a lawsuit in the U.S. District Court for the District of Nebraska to prevent construction of the line, which court at first granted a temporary restraining order in favor of the plaintiff, but shortly thereafter ruled in favor of NPPD. A condemnation action was filed on August 14, 1979, to acquire the necessary right-of-way over Indian lands. However, in an order filed October 17, 1979, the U.S. Court of Appeals for the Eighth Circuit issued an order staying the condemnation action and any construction east of the western boundary of the Winnebago Indian Reservation, which order was in force until April 11, 1980, when it was lifted.

The condemnation case in the U.S. District Court finally went to trial in December of 1980, and on June 4, 1982, the court ruled that NPPD did not have the power to condemn easements over the Indian-allotted land. This action was appealed to the U.S. Court of Appeals, which in October of 1983 reversed that portion of the district court's decision and held that NPPD did have the power to condemn such lands. Following this ruling clarifying the various rights of the parties regarding the acquisition of easements over Indian properties, NPPD obtained all of the necessary easements to give NPPD an uninterrupted right-of-way for the completion of the transmission line. It was at this point that certain of the appellants gave notice to NPPD that the easements of 1978 and 1979 would not be honored. The present litigation resulted.

Richard Green, construction manager of NPPD, gave testimony which explained the impossibility of utilizing the easements NPPD had in Thurston County until a continuous right-of-way could be obtained over the Indian lands, as follows:

Q All right. Why didn't you go and construct on those easements at that time?

A While N.P.P.D. had acquired easements, there were

also areas within Thurston County — scattered through and along down that right-of-way — that N.P.P.D. had not acquired, in particular the Winnebago Indian land. *And, the absence of that right-of-way or the gap left in those easements made it impossible to construct.* We had no access to go up and down the right-of-way of the transmission line. There were tower sites that we couldn't get to. The contractor had no means at all of which to string wire or to get in and haul materials. There were certain spots that he could get to, but he could not complete the construction.

(Emphasis supplied.)

Although the facts in this case are complex and the record voluminous, we believe the resolution of the dispute is fairly simple. Much of the appellants' legal argument relates to the sanctity of the easements as expressed by their written terms; i.e., an easement specific in its terms is decisive of its limits; if an easement is to continue until terminated in a certain manner, it will continue until so terminated; and if the language of an easement is clear and unambiguous, it may not be varied by parol evidence. With these principles of law we have no quarrel.

However, it seems quite apparent that there was no occasion when the right-of-way, taken as a whole, was not being used for the purposes stated therein. Spot easements acquired, but separated from each other by parcels over which no right-of-way had yet been obtained, had to of necessity simply be "banked" until an unbroken chain of right-of-way was available. As such, those easements were being used.

Although we have been cited to no case directly on point, nor have we been able to find one by our independent research, the case of *Vandewater v. Railway Co.*, 170 Iowa 687, 153 N.W. 190 (1915), may well be applied to the facts of this case by analogy.

In *Vandewater*, the Rock Island proposed to build a line of railway between Greenfield and Winterset, Iowa. Through its exercise of the right of eminent domain, an easement was obtained over the farm of the plaintiff, which lay between the two towns. The Rock Island commenced construction of the line in 1903, building the roadway from Winterset to about 2 miles from plaintiff's land, and from Greenfield to a point

approximately 1 mile from the farm. In the fall of 1903, the Rock Island quit the construction of the road from Greenfield to Winterset, gathered up its materials and equipment, and never returned to recommence construction. Although it does not appear in the reported opinion, it is assumed that it was more than 8 years after 1903 that this action was brought by the plaintiff. He sought to quiet title in himself because of a termination as a matter of law of all rights to the easement once held by the railway company.

The basis of the plaintiff's lawsuit was an Iowa statute, Iowa Code § 2015 (1897), which provided in part as follows:

> If the railway or any part thereof shall not be used or operated for a period of eight years, or if, its construction having been commenced, work on the same has ceased and has not been in good faith resumed for eight years, the right of way, including the road-bed, shall revert to the owner of the land from which said right of way was taken.

Following trial to the court, a decree was entered for the plaintiff, quieting title as prayed.

The Rock Island defended on the theory that the 8-year statute of limitations did not commence to run until construction had been actually commenced and work then abandoned, whereas construction had never been started on the plaintiff's land.

In rejecting this argument, the Supreme Court of Iowa stated as follows:

> To construct this railway, it was necessary to commence somewhere. They did commence at Winterset, and, as we take it, at Greenfield, and constructed a roadbed a large portion of the way between Winterset and the land in controversy, and a large portion of the roadbed between Greenfield and this land. To say that they had not commenced the construction would be to say that the construction was not commenced until the whole roadbed had been built. To say that the words "the construction" of a railway (to start the limitation against any particular landowner) required that the building of some portion of the road had been commenced on his land would be an unreasonable limitation on the words, "its construction

having been commenced." Its construction means the construction of the contemplated railway.

170 Iowa at 694, 153 N.W. at 193.

Adopting the reasoning of the Iowa court, we hold that a segment of a continuous right-of-way, once acquired for a stated purpose, continues to be used for that purpose during the period of time that the holder of the right continues in good faith its efforts to complete the acquisition of the entire right-of-way.

The judgment of the district court is affirmed.

AFFIRMED.